IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

TRACY LYNN DWIGGINS,
        Plaintiff,

vs.                                              Case No.: 3:18cv1497/LAC/EMT

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,
        Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

This case is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.    PROCEDURAL HISTORY

On March 6, 2015, Plaintiff filed an application for DIB, and in the application she alleged disability beginning February 15, 2013 (tr. 15).[1]  Her application was denied initially and on reconsideration, and thereafter Plaintiff requested a hearing before an administrative law judge ("ALJ").  A hearing was held on January 17, 2017, and on July 5, 2017, the ALJ issued a decision in which she found Plaintiff "not disabled," as defined under the Act, at any time through the date of her decision (tr. 15–26).  On April 26, 2018, the Appeals Council denied Plaintiff's request for review (tr. 1).    Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.    Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).

II.   FINDINGS OF THE ALJ

On July 5, 2017, (date of ALJ decision), the ALJ made several findings relative to the issues raised in this appeal (tr. 15–26):

1)    Plaintiff last met the insured status requirements of the Act on September 30, 2014;

---

[1] All references to "tr." refer to the transcript of Social Security Administration record filed on August 30, 2018 (ECF No. 5).  The page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system.

2) Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of February 15, 2013 through her date last insured of September 30, 2014;

3) Through the date last insured, Plaintiff had the following severe impairments: hypothyroidism, Hashimoto's thyroiditis, hypertension, fibromyalgia, diabetes mellitus, gastroparesis, ulcerative colitis, and osteoporosis;

4) Through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1;

5) Through the date last insured, Plaintiff had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except for the following limitations: Plaintiff should avoid climbing ladders, ropes, and scaffolds. She should avoid work at unprotected heights and around hazardous machinery;

6) Through the date last insured, Plaintiff was capable of performing past relevant work as a cosmetologist. This work did not require the performance of work-related activities precluded by Plaintiff's residual functional capacity; and

7) Plaintiff was not under a disability, as defined in the Act, at any time from February 15, 2013, the alleged onset date, through September 30, 2014, the date last insured.[2]

## III. STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of

---

[2] These time frames are likewise the ones relevant to this appeal.

the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh

the evidence, or substitute its judgment for that of the Commissioner. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her/his previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.     If the claimant is performing substantial gainful activity, she is not disabled.

2.     If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.     If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.     Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052

(11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

A.    Relevant Medical History[3]

Plaintiff's treatment extends back to July of 2010, when she complained of fatigue and lack of weight control during a medical visit with Daniel Hickman, M.D. (tr. 524). Dr. Hickman believed her symptoms were related a hypothyroid condition. Plaintiff saw Dr. Vishnnu Behari, M.D., in September of 2010, to whom she reported that she was diagnosed with Hashimoto's Thryroiditis approximately 15 years ago and that she had a history of rheumatology and endocrine issues, fibromyalgia and chronic fatigue (tr. 527). Plaintiff reported that she had reduced her working hours as a hairdresser to three days per week due to tiredness (tr. 527). Dr. Behari's impressions were hypothyroidism, metabolic syndrome, hypercortisolism, and a

---

[3] Because Plaintiff's brief is concerned with whether the ALJ's evaluation of the evidence in the record is properly supported, the medical evidence discussed in this section is largely derived from the opinion of ALJ. While the ALJ addressed Plaintiff's impairments from a mental health standpoint, because Plaintiff does not invoke mental health issues in her appeal, the court will not recount or review this information.

Case No.: 3:18c1497/LAC/EMT

history of abnormal hormone levels (tr. 529). He prescribed Ziac, Lyrica, hydrocodone, and Cymbalta (tr. 530).

At an October 8, 2012, visit, Dr. Behari indicated he believed Plaintiff to have metabolic syndrome, for which he prescribed Metformin (tr. 21, 337). Plaintiff also complained of abdominal pain and diarrhea; in November 2012 an upper GI endoscopy was performed, and a 1l-2 centimeter hiatal hernia was found along with mild diffuse gastric erythema/mild gastritis (tr. 21, 446–48). Dr. Behari also suggested testing for an endocrine disorder and a possible referral to a rheumatologist (tr. 335). It was also noted that Plaintiff had gained 50 pounds during the preceding three years despite a "formal exercise program" walking 2 or 3 days every week, and that Plaintiff was working four days per week (tr. 334).

In February and March of 2013, Plaintiff presented to the Mayo Clinic in Jacksonville, with her chief complaint being carcinoid syndrome (tr. 229). Medical indications included abnormal weight gain, flushing episodes, a history of hypothyroidism, and borderline diabetes (tr. 229). Regarding the diabetes, it was noted by Timothy A. Woodward, MD, that Plaintiff was taking metformin, but that there was "no frank record of her diabetes in reviewing her outside information (tr. 232). Plaintiff also reported that she had suffered from general malaise and fatigue

for seventeen years, those years corresponding to the birth of her daughter (tr. 229). It was also noted that, over the past several years, there had been concern over possible endocrinological and rheumatological issues. Dr. Woodward broadly noted, "At this point, she is, understandably, confused as to diagnoses with a range from diabetes mellitus and hypothyroidism to carcinoid syndrome. For this reason, she is here at Mayo" (tr. 230).

Plaintiff visited the emergency room on May 13, 2013 because of nausea, abdominal pain, and vomiting (tr. 272). She was diagnosed with cholelithiasis and underwent a laparoscopic cholecystectomy to remove her gall bladder (tr. 280–81).

Further notes from her visits to the Mayo Clinic in June of 2013 show that Plaintiff reported a history of diffuse muscle pain. She saw William Ginsburg, M.D., who noted her to be working as a hairdresser and experiencing intermittent numbness in her hands, particularly so on the right (tr. 242). Plaintiff also reported significant fatigue and stated she was unable to drive no more than two hours because she would becoming groggy (tr. 242). Dr. Ginsberg indicated that her fibromyalgia would be responsible for her diffuse muscle pain (tr. 242). Regarding her fatigue, he arranged for Plaintiff to undergo a sleep consult. He stated that Plaintiff had no symptoms of scleroderma or of an underlying connective tissue disease and that while she had

symptoms suggestive of carpal tunnel syndrome, it was not severe (tr. 243).  A diagnosis of prediabetes was noted but also the fact that Plaintiff had been off her metformin for months (tr. 223).  Plaintiff underwent thyroid testing at Mayo, which revealed an "over replacement" and resulted in an adjustment to her thyroid hormone medication (tr. 223).  Medical testing confirmed her Hashimoto's thyroiditis (tr. 449–450).

On February 7, 2014, Plaintiff was seen in the emergency room with symptoms of high blood sugar, dizziness, blurred vision, polydipsia, and polyuria.  While Plaintiff stated that she "[did] not have diabetes that [she knew] of," new onset diabetes mellitus was diagnosed, and glipizide was prescribed (tr. 396–98).  Plaintiff returned to the emergency room on February 10, 2014, reporting that her blood sugar levels were in the 300's and 400's and that she was not feeling well all weekend (tr. 317).  Plaintiff was provided insulin (tr. 321–22).

On February 17, 2014, Plaintiff established care with Walter Bew, MD.  With regard to her diabetes, a foot exam was normal with no lesions or injuries.  A monofilament test was normal bilaterally.  Dr. Bew's assessments included Type 2 diabetes, hypertension, hypothyroidism, depression with anxiety, fibromyalgia, and restless legs syndrome (tr. 505).

Plaintiff again went to the emergency room on February 25, 2014, because of abdominal pain and nausea. Her glucose levels were again high, and she was again treated with insulin (tr. 308–312). For followup care, Plaintiff was seen at Greater Gulf Coast Primary Care on February 27, 2014. Readings from her glucometer showed that her blood sugars had been between 200 and 300. Because she had not yet been started regularly on insulin, a prescription was provided by Vishnue N. Behari, MD. (tr. 330). Dr. Behari diagnosed her with type II diabetes mellitus but acknowledged that type I diabetes remained a possibility (tr. 329–30).

In a May 26, 2014, visit with Dr. Bew, Plaintiff stated that she had been diagnosed with type l diabetes and was taking insulin (tr. 498). Plaintiff reported that she continued to experience pain from her fibromyalgia, along with neck and back pain, but without numbness or weakness in her extremities (tr. 498). Plaintiff was prescribed Voltaren gel for pain, and her hypothyroidism and hypertension were noted to be stable on her current medications (tr. 498).

Greater Gulf Coast Primary Care notes dated June 12, 2014, reflect a follow-up for diabetes. Her blood sugars levels were in the 150 to 175 range, and she reported nausea and abdominal pains (tr. 324). Her hemoglobin Alc readings were originally over 11%, had reduced to 7.9% by February of 2014, but were back up to 8.4% at the

time of examination (tr. 324). Plaintiff indicated she was compliant with her insulin but was also taking 800mg of ibuprofen daily because she was experiencing aches and pains in her legs from excessive standing at her beauty shop (tr. 324). Plaintiff reported that her stools were occasionally black and tarry, and she was consequently advised to use acetaminophen instead of ibuprofen (tr. 324). It was suggested that she may have a bleeding ulcer and would need a referral to a gastroenterologist (tr. 324). It was also noted that Plaintiff had undergone bone density testing and an x-ray of her back in May 2014, the results of which were "pretty benign" (tr. 324).

Plaintiff went to the emergency room on July 12, 2014, complaining of low blood sugar; Plaintiff was also observed to be intoxicated at the time (tr. 384). Her blood sugar was stabilized, and she was told to rest and avoid alcohol (tr. 392).

Plaintiff again saw Dr. Bew on August 20, 2014, requesting a referral to a gastroenterologist because she had not seen one since she was diagnosed with gastroparesis. She was started on Zofran (tr. 493–95).

As far as the portion of the medical record that postdates Plaintiff's DLI, she followed up with Dr. Behari on December 18, 2014, reporting that she was feeling sluggish (tr. 454). Dr. Behari noted that her insulin pump recordings showed a lot of lows in her blood sugar levels, which were primarily caused by over-correcting the

highs. He adjusted her pump settings accordingly (tr. 454). Plaintiff also indicated that she was working in her hair stylist job three to four days per week (tr. 454). Plaintiff continued to report irregular bowel movements and diarrhea (tr. 454).

Plaintiff was seen at Gastroenterology Associates of Pensacola in January and March of 2015, as she had been referred for an endoscopic ultrasound to rule out neuroendocrine tumors (tr. 418). The results of the ultrasound showed erosive gastritis (mild chronic gastritis and no H. pylori) and no tumors (tr. 414). Plaintiff reported still having diarrhea about three times per week along with abdominal pain (tr. 414).

Plaintiff also continued followup with Dr. Bew on March 25, 2015, who noted that Plaintiff's hypertension, fibromyalgia and insomnia were all stable on her current medications and that her blood pressure was generally 130/80 (tr. 483).

Notes from a letter written by Ashton L. Graybiel, MD, on May 25, 2016, reflect that Plaintiff had a positive rheumatoid factor and had complained of left hip pain over the last six months and a history of knee, ankle, wrist, and MCP pain (tr. 547–48). Her history of ulcerative colitis and daily use of Entocort to treat it were also noted (tr. 547).

Plaintiff was admitted to the emergency room in July of 2016 with issues of nausea and vomiting; her principal diagnosis was type 1 ketoacidosis (tr. 581). Plaintiff's insulin pump had broken, and her blood sugars were at the 600 range (tr. 583). A new pump was ordered and received (tr. 583). Plaintiff was similarly admitted to the emergency room in November of 2016 (tr. 550). It was noted that Plaintiff was having difficulties with her pump, and she was instructed on better ways to troubleshoot problems that arise (tr. 559). As noted by the ALJ, in February of 2017 by Dr. Behari described Plaintiff as having "had a stormy past few months and finally things are less stressful" (tr. 622).

The ALJ considered the physical RFC assessment that was provided by Cynthia Kimble, MD, of Disability Determination Services on June 13, 2015 (tr. 81–84). Dr. Kimble determined that Plaintiff was capable of working at the light exertional level but that she should avoid concentrated exposure to extreme temperatures, vibration and physical hazards (machinery, heights, etc.) (tr. 82).

B.    Personal History

Plaintiff testified at her January 17, 2017, hearing before the ALJ as follows.She stated that she has lived in the same house with her husband and daughter since 1999 (tr. 39). Plaintiff had vocational training in cosmetology after she

completed high school and has worked as a cosmetologist since the early 1990's (tr. 40, 53).

She stated that she weighed 140 pounds and has lost 50 pounds over the past two years, which she attributed to her diagnosis as a brittle diabetic and her hospitalizations with ketoacidosis (tr. 40–41). Plaintiff stated that she has not worked in her job since she became disabled in February 2013, though she did indicate later in the hearing that, after attempting to return to work in 2010, she ceased working after that (tr. 41, 51–52). She stopped working as a hairstylist because of pain, numbness and burning sensations in her hands, feet, and back (tr. 42). Plaintiff stated that she was unable to stand up all day and started stumbling frequently while at work (tr. 42). She stated that the burning in her hands and feet made it difficult for her to grasp and hold objects and that it caused her to drop her tools at work (tr. 43–44). While Plaintiff acknowledged that she had a driver's license, she generally did not drive because she did not feel comfortable doing so (tr. 41).

Asked about her fibromyalgia and auto immune disease, Plaintiff stated that her symptoms progressed faster than she thought they would. While she has had her symptoms treated with medication, "the more and more they put me on the more and more I kind of am not mentally able to do things that I used to do, but also physically

I'm not able to do as well" (tr. 42–43). She also testified to having severe pain and tight muscles in her neck, which she has been told relates to her fibromyalgia (tr. 45). Plaintiff related that her pain has increased over time since she was diagnosed with diabetes in 2014 (tr. 46). She also related that she suffers from fatigue on a daily basis (tr. 51). Plaintiff related that she has had a history of hospitalizations in 2013 and 2014 due to her brittle diabetes and the accompanying difficulties in regulating her blood sugar levels (tr. 43).

V.    DISCUSSION

Plaintiff first claims that the ALJ failed to articulate sufficiently explicit reasons for discrediting her subjective complaints of pain and other symptoms.

When a claimant attempts to establish disability through her own testimony about her pain or other subjective symptoms, a two-part "pain standard" applies. Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002). The pain standard requires the claimant to show "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise" to the claimed symptoms. Wilson, 284 F.3d at 1225; see also 20 C.F.R. § 404.1529(a)–(b). If the ALJ determines that the claimant has a medically

determinable impairment that could reasonably produce the claimant's pain or other symptoms, then the ALJ evaluates the extent to which the intensity and persistence of those symptoms limit the claimant's ability to work. 20 C.F.R. § 404.1529(b)–(c). At this stage, the ALJ considers the claimant's history, the medical signs and laboratory findings, the claimant's statements, statements by medical sources, and other evidence of how the pain affects the claimant's daily activities and ability to work. *Id*. § 404.1529(c).

An ALJ must "articulate explicit and adequate reasons" for discrediting a claimant's allegations of completely disabling symptoms. Foote, 67 F.3d at 1561–62. "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court." Id., 67 F.3d at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)). The ALJ's determination does not need to cite "'particular phrases or formulations,'" but it cannot merely be a broad rejection of a claimant's allegations which is "'not enough to enable [the court] to conclude that [the ALJ] considered her medical condition as a whole.'" Foote, 67 F.3d at 1561 (quoting Jamison v. Bowen, 814 F.2d 585, 588–90 (11th Cir. 1987)); *see also* Dyer v. Barnhart, 395 F.3d 1206 (11th Cir. 2005) (same). "A clearly articulated credibility finding with substantial supporting evidence in the record will

not be disturbed by a reviewing court." Foote, 67 F.3d at 1561-62 (citing MacGregor

v. Bowen, 786 F.2d 1050, 1054 (11th Cir.1986)).

The ALJ found Plaintiff's medically determined impairments would reasonably

be expected to cause her alleged symptoms but that her statements regarding the

intensity, persistence and limiting effects of her symptoms were not entirely

consistent with, nor well supported by, the evidence in the record (tr. 21). In reaching

her decision, the ALJ cited to several aspects of the record.

While noting that Plaintiff had gone to the emergency room four times because

of her diabetes, the ALJ also found that these events occurred during the initial stages

of Plaintiff's diagnosis, and before she had been prescribed insulin for home use (tr.

24). The ALJ also noted that Plaintiff appeared intoxicated during her fourth visit to

the emergency room, which likely would have affected her glucose levels (tr. 24–25).

The ALJ further noted that Plaintiff responded favorably with use of her insulin

pump, with lower A1c readings, and while Plaintiff may have later experienced a

"stormy" year controlling her diabetes, this occurred during 2016–2017, well after her

DLI date of September 30, 2014 (tr. 25). While Plaintiff carried a diagnosis of

diabetic neuropathy, the ALJ cited the fact that, in February of 2014, a monofilament

test returned a normal result, a foot exam revealed no aberrations, and no further testing had been indicated (tr. 25).

Nonetheless, in deference to Plaintiff's fluctuating blood sugars, the ALJ included in her RFC assessment for light work that Plaintiff be restricted from climbing ladders, ropes, and scaffolds, work at unprotected heights, and work around hazardous machinery (tr. 25).

With regard to Plaintiff's Hashimoto's thyroiditis, hypothyroidism, and hypertension, the ALJ noted the general stability of these conditions under medication (tr. 25, 498–500). As with Plaintiff's diabetes, however, the ALJ recognized that the same restrictions with regard to heights and working with machinery should apply because Plaintiff's issues with headaches, dizziness, and fatigue (tr. 25). Concerning Plaintiff's fibromyalgia, the ALJ noted that Plaintiff has taken Lyrica to beneficial effect, as evidenced by the fact that she has not sought out pain management or additional specialists (tr. 25). With regard to her gastritis and reflux esophagitis, the ALJ noted that, after her diagnosis in 2013, Plaintiff did not pursue further medical care until 2015, which post-dates her DLI, when she was referred for an endoscopic ultrasound (tr. 25). The ALJ found this to indicate the manageability of her symptoms with medication.

In assessing Plaintiff's RFC, the ALJ assigned partial weight to the opinion of Dr. Kimble. While she found Dr.Kimble's conclusion that Plaintiff could perform work at the light exertional level to be consistent with medical evidence of record, the ALJ disagreed with Dr. Kimble's finding that Plaintiff should be restricted from temperature extremes. The ALJ found sufficient Plaintiff's restrictions from ladders, ropes, and scaffolds.

Finally, the ALJ also made the following statements with regard to Plaintiff's work history:

> While the record does reflect symptom reports, diagnostics, and treatment, [Plaintiff] continued to work throughout the period at issues [sic]. She told the consultative examiner that she worked until February 2014 [tr. 404]. In June 2014, she was still working, as she took ibuprofen for excessive periods of standing at the beauty shop [tr. 324–27]. Even as her diabetes issues worsened after the date last insured, she managed to work three to four days per week [tr. 454–57]. This ability to continue working in at least some capacity during the period at issue suggests that [Plaintiff's] symptoms were not as severe as her testimony suggests.

(Tr. 25).

In view of the above, the Court concludes that the ALJ fairly assessed Plaintiff's testimony regarding her subjective complaints and pain symptoms and expressly discredited them as stated in her opinion. The ALJ's conclusion, that

Plaintiff's subjective symptoms were not consistent with the record evidence, was

supported by substantial evidence and will not be disturbed.

In so holding, the court notes Plaintiff's suggestion that, since Plaintiff was

working 3 days per week, she could not work the other two, and this would be

grounds for a finding of disability. However, as the ALJ indicated, Plaintiff was

working full time as late as June of 2014, albeit with need to take ibuprofen because

she was on her feet all day. The ALJ did acknowledge that Plaintiff later reported

only working 3 to 4 days per week, but she also noted that this occurred after her DLI.

Moreover, the ALJ did not cite to this fact in order to hold that Plaintiff was only able

to work a partial week; she cited the fact to underscore that Plaintiff's assertion that

her symptoms were severe enough to prevent her from working were inconsistent

with the record.

Plaintiff also claims that the ALJ failed to properly consider her lengthy

earnings history in making her assessment. Plaintiff's contention here is that the ALJ

failed to properly account for the fact that Plaintiff worked in earnest for as long as

she was able. Plaintiff cites Lafond v. Comm'r of Soc. Sec., No. 6:14-cv-1001-

ORL-DAB, 2015 WL 4076943 (M.D. Fla. July 2, 2015), which held that a lengthy

and continuous record of past work should be taken as a factor in determining the

credibility of a claimant's claim of disability, reasoning that "it is unlikely someone would trade in their productive, and lucrative, work career for the far less lucrative 'career' of receiving disability benefits." *Id.* at \*7 (citing <u>Horan v. Astrue</u>, 350 Fed. App'x 483, 484 (2d Cir.2009)).

Plaintiff attempts to use this precept to argue that the ALJ erred by not giving credit to her claim of disability on account of her strong work history. But as the ALJ amply cited, the record showed that Plaintiff worked for a longer period of time than she stated, and significantly, that she worked throughout her alleged disability period. That the ALJ would evaluate her work history in this manner is valid and is not derogated by the broader proposition that a claimant's consistent work history should be taken as a positive. Thus, Plaintiff's contention regarding the ALJ's use of her work history is not well-taken.

VI.    CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is **ORDERED:**

1.     The decision of the Commissioner is **AFFIRMED**, and this action is **DISMISSED**.

2.     **JUDGMENT** shall be entered, pursuant to sentence four of 42 U.S.C. § 405(g), **AFFIRMING** the decision of the Commissioner.

3.     The Clerk is directed to close the file.

**ORDERED** on this 19th day of September, 2019.


_____s/ L. A. Collier_____
Lacey A. Collier
Senior United States District Judge